FILED

2010 Jul-06  PM 04:18
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **KENNETH LAMAR SANFORD,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Civil Action No. 5:09-CV-963-RDP** |
| | } | |
| **MICHAEL J. ASTRUE, Commissioner,** | } | |
| **Social Security Administration,** | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OF DECISION

Plaintiff, Kenneth L. Sanford, brings this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act (the "Act"), seeking judicial review of the decision of the Commissioner of Social Security ("Commissioner") denying his application for disability and Disability Insurance Benefits ("DIB"). *See* 42 U.S.C. §§ 405(g), 1383(c). For the reasons outlined below, the court finds that the decision of the Commissioner is due to be affirmed because it is supported by substantial evidence and proper legal standards were applied.

## I.      Proceedings Below

Plaintiff filed his application for disability and DIB on January 11, 2007, alleging a disability onset date of August 13, 2006. (Tr. 74-81, 87, 91). Plaintiff's application was denied on April 2, 2007. (Tr. 56-60). Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ") on May 29, 2007. (Tr. 61-62). Plaintiff received a hearing before ALJ Patrick R. Digby on November 13, 2008. (Tr. 22-53, 68-73). In his December 29, 2008 decision, the ALJ determined that Plaintiff is not eligible for a period of disability or DIB even though he suffers from a severe impairment, degenerative disc disease, because it is not an impairment that meets or medically equals

one of the listed impairments in the Act.  (Tr. 13-14).  Furthermore, the ALJ found, after considering the entire record, Plaintiff has the residual functional capacity ("RFC") to perform medium work activity as found in the Functional Capacity Evaluation ("FCE") conducted on December 8, 2005, limiting Plaintiff to lifting a maximum of forty pounds[1] but meeting all positional tolerances.[2]  (Tr. 14, 445-52).  As a result, it was the ALJ's determination that Plaintiff is capable of performing past relevant work as a forklift operator.  (Tr. 17).  Plaintiff sought review of the ALJ's decision by the Appeals Council, but review was denied on April 6, 2009.  (Tr. 1-4).  Therefore, the denial of benefits became a final decision of the Commissioner and, thus, is a proper subject of this court's review.

## II.    Facts

Plaintiff was born on August 27, 1951, (fifty-seven years old at the time of the hearing) and he has completed school through the twelfth grade with no college or trade school experience outside of on-the-job training.  (Tr. 28, 111, 129-30, 304-06).  Plaintiff was previously employed by the 3M Company for thirty-five years as a shipper/checker, and drove a stand-up forklift.  (Tr. 30, 32, 102-03, 257, 304-06).  Plaintiff alleges that he has been unable to engage in substantial gainful activity since August 13, 2006 due to pain in his neck, lower back, hip, and left leg, as well as reported symptoms of depression and anxiety.  (Tr. 30-35, 54, 61, 98-99, 214-19, 224, 226, 304-06).

On May 4, 2005, prior to his alleged onset date of disability, August 13, 2006, Plaintiff was involved in an on-the-job injury in the course of his employment with the 3M Company .  (Tr. 32-33,

---

[1] This was an amount less than required as noted in his job description. (Tr. 445).

[2] Positional tolerances include sitting, squatting, walking, sustained bending, repetitive bending, overhead reaching, forward reaching, repetitive reaching, sustained squatting, repetitive squatting, pivot twisting, push/pull, fine motor, and gross motor. (Tr. 445).

2

100, 129-33, 198-204, 210-12, 216, 451-52).  Subsequent to the injury, on May 5, 2005, Plaintiff

began seeing Dr. Michael Lowery of Occupational Health Group of Decatur ("OHG"). (Tr. 137-42).

While under the care of Dr. Lowery, it was noted that Plaintiff was involved in an accident at work

when the forklift he was operating "locked up," causing Plaintiff to be thrown off the machine

without falling to the ground or striking anything.  (Tr. 137).  Dr. Lowery described Plaintiff's

injuries as those stemming from being "severely jerked when he was ejected from the forklift." (*Id.*).

At the initial consultation, Plaintiff complained of pain in his upper back, neck, and hip, but denied

any pain in his arms or legs.  (*Id.*).  Plaintiff was prescribed muscle relaxers and pain medication,

and  instructed to limit his activity for the next several days.  (*Id.*).  Ultimately, Plaintiff saw Dr.

Lowery three times and Dr. McMurry once while receiving treatment at OHG.  (Tr. 136-47).  On

May 16, 2005, Dr. Lowery planned for Plaintiff to begin physical therapy the next day.  (Tr. 140).

Plaintiff began seeing Dr. Ghavam from Encore Rehabilitation for physical therapy

treatments on May 17, 2005. (Tr. 144-60).  Plaintiff engaged in physical therapy thirteen times from

May 17, 2005 through June 27, 2005.  (*Id.*).  In the beginning, Plaintiff would exercise for about

twenty minutes and then receive a "hotpack" for fifteen or twenty minutes, but as treatment

continued, Plaintiff would exercise for twenty-five to thirty-five minutes. (Tr. 151-53).   However,

on June 1, 2005, Plaintiff began to complain about shoulder pain.  (Tr. 150).  After June 1, 2005,

Plaintiff  received only heat treatment during physical therapy.  (Tr. 144-50).  On June 17, 2005,

Plaintiff claimed he had an MRI, but there is no definite  statement of an MRI found in Dr. Ghavam's

notes.  (Tr. 109, 144-60).  As Plaintiff continued physical therapy, it was documented in the physical

therapist's notes that Plaintiff claimed that his pain levels decreased during the therapy but increased

thereafter. (Tr. 144).  On June 27, 2005, Plaintiff was discharged from therapy.  (*Id.*).  On December

3

8, 2005, Dr. Ghavam referred Plaintiff to Healthsouth where he had an FCE conducted, revealing that he was capable of lifting forty pounds and performing all positional tolerances on a frequent basis. (Tr. 445-50). Subsequent to an MRI ordered by Dr. Randall Sparks, Plaintiff again saw Dr. Ghavam for neck and back pain on October 10, 2006, and Dr. Ghavam noted that Plaintiff had normal extremity strength. (Tr. 224). Additionally, Dr. Ghavam documented that Plaintiff has a small herniated disc on the left at C5-6 with some degenerative changes at C6-7. (*Id.*). Dr. Ghavam indicated that he reviewed options for treatment with Plaintiff, but Plaintiff was not interested in any further intervention. (*Id.*).

Both before and after his work-related injury, the medical records indicate that Plaintiff also saw a surgeon, Dr. R.C. Tuckier, for various reasons involving chest pains, biliary dyskinesia, gallbladder surgery, ulcers, colon polyps, constipation, abdominal pain, and a hiatal hernia. (Tr. 161-97). Plaintiff presented to Dr. Tuckier on December 12, 2005 for an EGD with biopsy of gastral mucosa, more commonly known as gallbladder surgery. (Tr. 177). Plaintiff saw Dr. Tuckier again on April 27, 2006. (Tr. 195). However, there is no mention of pain in regards to Plaintiff's shoulder, back, hip, or neck in Dr. Tuckier's notes. (Tr. 161-97). Plaintiff saw Dr. Tuckier again on May 1, 2006 for a prostate screening. (Tr. 190). In review of the medical records, Plaintiff has seen Dr. Tuckier for various reasons, but not for back, neck, hip, or shoulder pain as no reference to those ailments or even the work-related injury can be found in Dr. Tuckier's notes. (Tr. 161-97).

At the referral of Dr. Ghavam, Plaintiff saw Dr. Keith Anderson for a psychiatric evaluation on January 31, 2006. (Tr. 210). Dr. Anderson documented that this visit was work-related, referencing the cervical strain coupled with significant shoulder pain suffered by Plaintiff. (*Id.*). Dr. Anderson ordered an MRI of the shoulder, and noted that Plaintiff had significant shoulder pain with

4

internal and external rotation.  (Tr. 210).  After reviewing the MRI results on March 16, 2006, Dr. Anderson found that Plaintiff had a small tear in the shoulder tendon.  (Tr. 207).  This report caused Dr. Anderson to refer Plaintiff to Dr. Eric Janssen for further evaluation.  (*Id.*).  Dr. Janssen did not recommend surgery, but did limit Plaintiff's overhead reaching activities and recommended therapy. (*Id.*).  Additionally, Dr. Anderson ordered an EMG/Nerve Conduction Study of the upper extremities and an X-ray of the hip.  (*Id.*).  Dr. Anderson saw Plaintiff again on April 5, 2006, and noted that Plaintiff stated that the physical therapy was not helping.  (Tr. 203).  After reviewing Plaintiff's nerve conduction tests, Dr. Anderson found that the nerves in the left shoulder area were unremarkable. (Tr. 204).   Additionally, Dr. Anderson reviewed Plaintiff's EMG and found no evidence of spontaneous activity and the recruitment pattern and amplitude of motor units was unremarkable. (*Id.*).  Dr. Anderson documented his impressions regarding the tests and noted as follows:  (1) the electrodiagnostic study of the left upper extremity was normal; and (2) there was no evidence of carpal tunnel syndrome, cubital tunnel syndrome, peripheral neuropathy, or radiculopathy. (*Id.*).  Dr. Anderson noted that Plaintiff should try Mobic for two more weeks, but discontinue the Lidoderm Patch since it was not helping.  (*Id.*).  Importantly, Dr. Anderson noted, "[a]t this point, I'm not sure what else to offer this patient" because he had already had an FCE.  (*Id.*).

Plaintiff went to Dr. Anderson again on May 11, 2006, and at that visit, Dr. Anderson noted that the MRI scan conducted by Dr. Janssen revealed tendonitis, but the findings were very mild not requiring any surgical intervention or treatment.  (Tr. 200).  In this medical record, Dr. Anderson noted the unusual nature of the physical therapist's reports of resistance with any movement of Plaintiff's left shoulder.  (*Id.*).  Dr. Anderson noted that Plaintiff's pain complaints were unchanged and the medications had not helped.  (*Id.*)  Upon checking the left shoulder, Dr. Anderson found that

when Plaintiff moved the shoulder about eighty to ninety degrees, he pulled down very hard and did not allow the arm to be raised in such a way that became a "ratcheting-type" of movement. (Tr. 201). Dr. Anderson indicated that he did not feel Plaintiff would benefit from any further treatment or medications. (*Id.*). Dr. Anderson noted that he reviewed the FCE conducted by Healthsouth on December 8, 2005 and compared it with his findings regarding Plaintiff. (*Id.*). Dr. Anderson indicated that during that FCE, Plaintiff could raise his arm above his head, but could not get Plaintiff to raise his arm ninety degrees. (*Id.*). These facts led Dr. Anderson to the conclusion that there was very strong "emotional overlay" to Plaintiff's pain complaints because his exam "[did] not fit what [was found] on [the] MRI." (*Id.*). Furthermore, Dr. Anderson documented that "the patient should be able to perform his job as a forklift operator," and Plaintiff did not need to see him in the future. (*Id.*).

On August 2, 2006, Plaintiff was admitted to the Decatur General Hospital for depression and was held for five days for safety and observation. (Tr. 214-19). While there, Plaintiff was under the care of Dr. Fredette because Plaintiff claimed he was suffering from depression due to a conflict at work where he believed he was being forced into retirement. (Tr. 214, 216). Dr. Fredette noted that Plaintiff was seeing Dr. Sparks who had prescribed Plaintiff Lortab and Xanax. (Tr. 216). Plaintiff told Dr. Fredette that he had not taken those pills in three days, but Dr. Fredette noted that Plaintiff brought all of his medications with him to the hospital except for the Lortab and Xanax. (*Id.*). Plaintiff's medical record indicates that Dr. Fredette needed to inspect the Lortab and Xanax bottles to rule out overuse of these medications and coordinate pain management with Plaintiff's outpatient physician. (*Id.*). Dr. Fredette noted Plaintiff was able: 1) to walk with no apparent difficulties; 2) to bend down, putting his hands beyond his knees with no difficulty; 3) to bend side

to side with no difficulty; and 4) to bend backwards with no apparent difficulty or severe pain although he was slow and cautious in this movement. (Tr. 218-19). Additionally, Dr. Fredette documented that Plaintiff possessed full strength in all four extremities. (*Id.*). Dr. Fredette noted that Plaintiff was no longer in need of inpatient treatment, and on August 7, 2006, Plaintiff was released to go home because he was no longer having suicidal thoughts and was sleeping better. (Tr. 214).

Dr. Randall Sparks of Gill Family Medicine in Decatur, Alabama, saw Plaintiff on May 19, 2006 for uncontrolled blood pressure and thyroid problems. (Tr. 253). On June 5, 2006, Dr. Sparks saw Plaintiff again for sinus problems. (Tr. 252). Dr. Sparks saw Plaintiff on June 27, 2006 for complaints of pain in his legs and hands. (Tr. 250). Reflex tests were conducted, and Dr. Sparks documented that Plaintiff's grips and reflexes appeared normal in light of his complaints. (*Id.*). Dr. Sparks ordered a thyroid ultrasound be conducted on Plaintiff on July 5, 2006. (Tr. 258). Plaintiff saw Dr. Sparks on July 12, 2006 for a follow-up appointment regarding hypothyroidism, but the scan revealed normal levels with an enlarged thyroid. (Tr. 248). On September 6, 2006, Plaintiff went to see Dr. Sparks again and was treated for allergies along with back and hip pain. (Tr. 239-41). X-rays were conducted on both the back and hip, and the results were normal. (*Id.*). Dr. Sparks indicated that Plaintiff had seen the company doctor, but was told that the pain in his hip was arthritis. (Tr. 239). On September 7, 2006, Plaintiff went to the Parkway Medical Center in Decatur and saw Dr. Randall Sparks. (Tr. 221). While there, Dr. Sparks had Plaintiff undergo an MRI that revealed mild broad-based central disc herniation at L4/L5, which produces a mild spinal stenosis. (Tr. 222). An electroneurodiagnostic test, which analyzed the nerves related to the symptoms complained of, was also conducted on Plaintiff's lower extremities, analyzing the nerves as related

to symptoms and pain about which Plaintiff complained.  (Tr. 230, 234).  However, it was determined that there was no evidence to suggest a peripheral neuropathy, a tibial neuropathy, or a peroneal neuropathy.  (*Id*.).

Prior to his work-related injuries, Plaintiff also saw Dr. Harold Blanton in Moulton, Alabama.  (Tr. 277-93).  Dr. Blanton noted that he had seen Plaintiff for several years, and it appears that blood pressure and tension anxiety were the primary reasons for his visits to Dr. Blanton.  (*Id*.).  Between 2004 and 2005 Plaintiff saw Dr. Blanton some twenty-five times for various reasons, including back pain, hip pain, sinus problems, tension anxiety, blood pressure, and kidney stones.  (*Id*.).  Dr. Blanton's notes indicate that Plaintiff has complained of back pain since July 13, 2004.  (Tr. 293).  Dr. Blanton documented that Plaintiff had been off work for back pain between 2004 and 2005 leading up to his accident at the 3M Company.  (Tr. 286, 289, 292-93).  Additionally, Plaintiff has missed work due to high blood pressure, which is noted in Dr. Blanton's records as being associated with tension at work.  (Tr. 279-81).  Dr. Blanton indicated that he had prescribed Plaintiff Lortab 10 for his pain, discussed pain medications with him, and informed him that he needed to "hold up on them as much as possible."  (Tr. 283).  The medical records indicate that Plaintiff did not see Dr. Blanton after he was involved in his accident at the 3M Company.  (Tr. 277-93).

Plaintiff saw Dr. Glenn Carmichael on or around March 1, 2007, and an FCE was conducted.  (Tr. 294-301).  Dr. Carmichael noted Plaintiff's past medical history of back problems and found that Plaintiff could lift fifty pounds occasionally; twenty-five pounds frequently; stand, walk or sit for six hours; and push/pull for unlimited amounts of time.  (Tr. 295).  Dr. Carmichael did not note any irregularities or abnormalities other than those noted in Plaintiff's previous medical history.  (Tr. 301).

On March 26, 2007, Plaintiff saw Dr. Barry Wood for a mental examination. (Tr. 304-20). Dr. Wood's notes indicate that Plaintiff reported he has a disability regarding neck and back pain associated with a work-related injury when he worked at the 3M Company. (Tr. 304). Plaintiff reported that he was prescribed Xanax by a pain specialist to address his discontinuous sleep and pain. (Tr. 305). Dr. Wood noted that Plaintiff suffers from an anxiety disorder, but Dr. Wood also noted that he believed Plaintiff's work ability or ability to attend is affected but not precluded by his mood symptoms. (Tr. 306).

In a psychiatric review conducted on March 28, 2007, Dr. Frank Nuckols documented that Plaintiff has impairments,[3] but they are not severe. (Tr. 307). This review also indicates that Plaintiff suffers from affective disorders and anxiety disorders. (*Id.*). However, in this report, Dr. Nuckols determined that the degrees of limitation that affected Plaintiff were "mild." (Tr. 317). Dr. Nuckols noted Plaintiff's past incidents with depression as discussed earlier, and he noted that Plaintiff stated no problems except with walking. (Tr. 319).

Plaintiff began seeing another doctor on June 9, 2006, Dr. Mark Murphy from the North Alabama Pain Service in Decatur, Alabama. (Tr. 326). Plaintiff saw Dr. Murphy fourteen times from June 9, 2007 through June 5, 2008 for pain treatment of the lower back and neck. (Tr. 337-443). However, a Functional Assessment form was completed by Dr. Murphy on May 14, 2007.[4]

---

[3] On the psychiatric review form, Dr. Nuckols found that Plaintiff's medical disposition was "Impairment(s) Not Severe." (Tr. 307-20). Dr. Nuckols based his findings on "Affective Disorders" and "Anxiety-Related Disorders." (Tr. 307).

[4] Because this form reflects that Plaintiff's capabilities are severely limited, he heavily relies upon it to claim that he cannot perform past relevant work: he (1) can stand only for two hours in an eight hour day for one-half to one hour at a time; (2) can walk only one hour in an eight hour day for one-quarter hour at a time; (3) can sit only five hours in an eight hour day for one to two hours at a time; and (4) must lie down at least one hour during the day as well as be able to have a stand/sit

(Tr. 321-22, 438-39).  Dr. Murphy's notes suggest that he did not see Plaintiff until June 11, 2007.

(Tr. 328-29, 332).  Plaintiff's chart and the initial form completed by Plaintiff both are dated June

9, 2007.  (Tr. 326, 330, 333).  Similar tests conducted by previous physicians were conducted again

while under the care of Dr. Murphy on June 27, 2007.  (Tr. 429-36).  A Nerve Conduction test

showed in the "study results" section that Plaintiff had normal readings.  (Tr. 435).  However, the

"summary" section indicates that the study was "abnormal," but it does not indicate as to why.  (*Id.*).

A neuropathy was found at the wrist, but other than that, the results were normal as to Plaintiff's

upper extremities.  (Tr. 435).  In regards to the lower extremities, test results showed that there were

abnormal A-wave findings consistent with an L5 radiculopathy, but the interpreting physician, Dr.

Murphy, also found that there was an inability to fully determine the F-wave results in order to make

an assessment of an L5 radiculopathy.  (Tr. 435-36).

  While under the care of Dr. Murphy, Plaintiff signed two Opiate Medicine Agreements where

he agreed not to abuse his medications and to drug testing at any time.  (Tr. 440-43).  Plaintiff was

drug tested eleven times while seeing Dr. Murphy. (Tr. 342-43, 349-51, 357-58, 364-65, 371-72,

378-79, 385-86, 392-95, 402-03, 409-10, 421-22).  Plaintiff had inconsistent tests on August 22,

2007 and September 18, 2007 that showed he was not taking his pain medications.  (Tr. 402-03, 409-

10).  Later, on February 12, 2008, Plaintiff had another inconsistent drug test that showed he was

taking pain medication not prescribed to him.  (Tr. 364-65).  Notwithstanding that it appeared that

Plaintiff had stopped taking his medication and had taken medication not prescribed to him, Dr.

Murphy continued to see Plaintiff and continued to prescribe him pain medication.  (Tr. 321-443).

---

option.  (Tr. 321-22, 438-39).  This form also indicates limits on Plaintiff's lifting capabilities to no
more than twenty pounds.  (*Id.*).  Moreover, this report states that a stand/sit option is necessary and
that Plaintiff cannot operate machinery because of side effects of the medication he is taking.  (*Id.*).

III.    **ALJ Decision**

Determination of disability under the Social Security Act requires a five step analysis.  *See* 20 C.F.R. § 404.1 *et. seq.*  First, the Commissioner determines whether the claimant is working.  Second, the Commissioner determines whether the claimant has an impairment which prevents the performance of basic work activities.  Third, the Commissioner determines whether claimant's impairment meets or equals an impairment listed in Appendix 1 of Part 404 of the Regulations.  Fourth, the Commissioner determines whether the claimant's RFC can meet the physical and mental demands of past work.  The claimant's RFC consists of what the claimant can do despite his impairment.  Finally, the Commissioner determines whether the claimant's age, education, and past work experience prevent the performance of any other work.  In making a final determination, the Commissioner will use the Medical-Vocational Guidelines in Appendix 2 of Part 404 of the Regulations when all of the claimant's vocational factors and the RFC are the same as the criteria listed in the Appendix.  If the Commissioner finds that the claimant is disabled or not disabled at any step in this procedure, the Commissioner will not review the claim any further.

The court recognizes that "the ultimate burden of proving disability is on the claimant" and that the "claimant must establish a *prima facie* case by demonstrating that he can no longer perform his former employment."  *Freeman v. Schweiker*, 681 F.2d 727, 729 (11th Cir. 1982) (citations omitted).  Once a claimant shows that he can no longer perform his past employment, "the burden then shifts to the [Commissioner] to establish that the claimant can perform other substantial gainful employment."  (*Id.*).

The ALJ found that Plaintiff has not engaged in substantial gainful activity since August 13, 2006, his alleged onset date of disability.  (Tr. 13).  The ALJ determined that Plaintiff has a severe

11

impairment: degenerative disc disease. (*Id.*). The ALJ found that Plaintiff's other reported impairments of depression and anxiety were mild and, thus, were not severe. (*Id.*). Further, the ALJ found that Plaintiff does not have an impairment or combination thereof that meets or medically equals the criteria of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, Appendix 1 of the Guidelines. (Tr. 13-14). According to the ALJ, Plaintiff's subjective complaints concerning his impairments and their impact on his ability to work are not fully credible due to the degree of inconsistency with the RFC assessment conducted on December 16, 2005 at Healthsouth and with the medical evidence established in the record. (Tr. 14-17). Ultimately, the ALJ determined that Plaintiff is capable of performing past relevant work as a forklift operator because the work-related activities are not precluded by Plaintiff's RFC. (Tr. 17).

The ALJ called a vocational expert to testify who was present throughout the hearing and familiar with Plaintiff's background. (Tr. 17, 43-47). The vocational expert testified that an individual with Plaintiff's limitations could perform jobs which exist in significant numbers in the regional and national economies. (Tr. 46). Based on the vocational experts's testimony, the ALJ found that a significant number of jobs exist in the national economy that Plaintiff is capable of performing and that Plaintiff was not under a disability at any time through the date of decision. (Tr. 17).

## IV.    Plaintiff's Arguments for Remand or Reversal

Plaintiff seeks to have the ALJ's decision, which became the final decision of the Commissioner following the expiration of the period for Plaintiff to file objections, reversed or, in the alternative, remanded for further consideration. (Doc. # 7 at 21). Plaintiff asserts that there are three reasons why this court should grant the relief sought: (1) the ALJ did not properly evaluate

Plaintiff's pain and non-exertional impairments; (2) the ALJ failed to properly refute the opinion of Plaintiff's treating physician, Dr. Mark Murphy; and (3) the ALJ gave little weight to the vocational assessment of Patsy Bramlett.  (Doc. #7 at 9, 13, 15).

## V.    Standard of Review

The only issues before this court are whether the record reveals substantial evidence to sustain the ALJ's decision,  *see* 42 U.S.C. § 405 (g); *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), and whether the correct legal standards were applied.  *See Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988);  *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).  Title 42 U.S.C. §§ 405(g) and 1383(c) mandate that the Commissioner's findings are conclusive if supported by "substantial evidence." *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).  The district court may not reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner; instead, it must review the final decision as a whole and determine if the decision is reasonable and supported by substantial evidence.  *See id.* (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

Substantial evidence falls somewhere between a scintilla and a preponderance of evidence; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Martin*, 894 F.2d at 1529 (quoting *Bloodsworth*, 703 F.2d at 1239) (citations omitted). If supported by substantial evidence, the Commissioner's factual findings must be affirmed even if the evidence preponderates against the Commissioner's findings.  *See Martin*, 894 F.2d at 1529. While the court acknowledges that judicial review of the ALJ's findings is limited in scope, the court also notes that review "does not yield automatic affirmance."  *Lamb*, 847 F.2d at 701.

**VI.    Discussion**

In light of the legal standards that apply in this case, the court rejects Plaintiff's arguments

for remand and/or reversal.  For the reasons outlined below, the court finds that the ALJ relied on

substantial evidence and applied the proper legal standards.

**A.    The ALJ Properly Refuted the Opinion of Dr. Mark Murphy.**

Plaintiff's first argument is that Dr. Mark Murphy was a treating physician, and the ALJ

violated the "treating physician rule" by improperly discrediting the opinion of Dr. Murphy in favor

of the FCE conducted at Healthsouth on December 16, 2005.  (Doc. #7 at 9).  The ALJ gave "little

weight" to Dr. Murphy's report and "great weight" to the December 16, 2005 FCE, which he found

to be more consistent with the totality of Plaintiff's medical record.  (Tr. 15).  The ALJ found that

Dr. Murphy's opinion regarding Plaintiff's pain complaints and Plaintiff's need to lie down during

the day lacked credibility because it was inconsistent with his own medical treatment.  (Tr. 17).

The opinion of a claimant's treating physician must be accorded substantial weight unless

some good reason exists for not doing so.  *See  Jones v. Bowen*, 810 F.2d 1001, 1005 (11th Cir.

1986) (citations omitted); *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997).  However, the

Eleventh Circuit has held that there are indeed certain situations when the ALJ may disregard the

opinion or reports of a treating physician.  The ALJ may ignore a treating physician's report or give

it less weight if the treating physician examined the claimant only once, if the evidence supports a

contrary conclusion, or when it is contrary to other statements or reports of that physician.  *See

Gibson v. Heckler*, 779 F.2d 619, 623 (11th  Cir. 1986); *Oldham v. Schweiker*, 660 F.2d 1078 (5th

Cir. 1981).  If an ALJ decides to reject or give less weight to a treating physician's opinion, then he

must clearly state his reasons for doing so.  Failure to adequately state his reasons is a reversible

error. *Lewis*, 125 F.3d at 1440 (citing *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986)). Where medical evidence of record does not conclusively contradict the treating physician's report or opinion and good cause is not shown, the law requires the ALJ to give the treating physician's opinion substantial weight. *Schnorr v. Bowen*, 816 F.2d 578, 581 (11th Cir. 1987). An ALJ does not commit reversible error when he articulates specific reasons for declining to give the treating physician's opinion controlling weight. *Leiter v. Astrue*, No. 09-15293, 2010 WL 1794177, at *4 (11th Cir. May 6, 2010).

Plaintiff argues that the ALJ violated the treating physician rule by failing to give explicit and adequate reasons for rejecting the opinion of Dr. Murphy and failing to properly refute the FCE conducted by Dr. Murphy. (Doc. #7 at 10). However, the court finds that the ALJ properly discounted Dr. Murphy's opinion, and there are explicit and adequate reasons to support the ALJ's findings in the record.

Good cause exists for disregarding a treating physician's report when the opinion is contradicted by other notations in his own record. *Edwards v. Sullivan*, 937 F.2d 580, 583-84 (11th Cir. 1991). Each visit that Plaintiff had with Dr. Murphy had its own medical notes and was signed by Dr. Murphy, except for the May 14, 2007 FCE on which Plaintiff so heavily relies. (Tr. 321-443). The fact that the FCE is dated almost one month before Plaintiff was even seen by Dr. Murphy and no notes or records refer to it is enough to refute the findings on that form.

Plaintiff attempts to resolve the date problem by claiming it is a handwriting error since Dr. Murphy evaluated Plaintiff on June 11, 2006. (Doc. #7 at 5). Yet, Dr. Murphy's notes on June 11, 2007 do not indicate that an FCE was conducted at this initial visit. (Tr. 328-29). Furthermore, those same notes document an evaluation of the patient and found the following: (1) "Constitutional

15

exam is unremarkable;" (2) "Gait and station reveals misposition without abnormalities;" (3) "Inspection and palpation of bones, joints, and muscles is unremarkable;" and (4) "No tests to report at this time. X-rays & MRI pending." (*Id.*). Plaintiff states in his brief, "[i]t could be argued that there was an inconsistency if there was particular evidence somewhere in Dr. Murphy's records objectively contradicting his stated opinion," and here, that is what exists. (Doc. #7 at 11). The FCE claims that Plaintiff requires a stand/sit option, the need to lie down, and an inability to stand or walk for prolonged periods of time. (Tr. 326-28). Yet, in his June 11, 2007 evaluation of Plaintiff, Dr. Murphy documented no abnormalities and unremarkable palpation of bones, joints, and muscles. (*Id.*). Additionally, the ALJ stated that there is nothing in the record to indicate that Dr. Murphy told the patient he would need to lie down. (Tr. 17).

An ALJ may reject the opinion of a treating physician where the physician's medical findings are inconsistent with his own reports as well as with other medical findings. *Creech v. Apfel*, 12 F. Supp. 2d 1293, 1298 (M.D. Fla. 1998). Also, the FCE allegedly conducted by Dr. Murphy on May 14, 2007 is entirely inconsistent with the notes of the June 11, 2007 evaluation in that the FCE states "see MRI," but as the notes indicate, an MRI was not yet ordered nor was there an X-ray ordered when the FCE is purported to have been conducted. (Tr. 17).

Plaintiff also argues that the ALJ did not address (1) the abnormal nerve conduction test ordered by Dr. Murphy conducted on June 27, 2007 or (2) did he address the MRI conducted on March 22, 2007. (Doc. #7 at 11). However, "an ALJ may reject any medical opinion if the evidence supports a contrary finding." *Leiter*, 2010 WL 1794177, at *4. The ALJ must "always consider the medical opinions in [the] case record together with the rest of the relevant evidence." 20 C.F.R. § 404.1527(b). In *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004), the Eleventh Circuit

held that the ALJ's determination that the treating physician's opinion should be given little weight was supported by substantial evidence because the ALJ identified several specific contradictions between the physician's opinion and other evidence of record.  Prior treating physicians, who conducted these same tests, documented that Plaintiff's pain complaints did not match what was found on the MRI, and they did not know what else could be done for Plaintiff.  (Tr. 15, 200-01, 204, 230, 234).

"[A]s a matter of law, the ALJ has the discretion to weigh objective medical evidence and may choose to reject the opinion of a treating physician while accepting the opinion of a consulting physician" if he shows "good cause for his decision."  *Gholston v. Barnhart*, 347 F. Supp. 2d 1108, 1114 (M.D. Ala. 2003).  The ALJ stated he considered the entire record in making his determination, which includes the records and statements of prior treating physicians, most especially ones that saw Plaintiff for the exact same reasons with contradictory findings.  (Tr. 14-16).  Additionally, this would explain why the December 16, 2005 FCE was relied upon by the ALJ.  It was more aligned with the statements and conclusions of the prior treating physicians because it showed that Plaintiff was not as limited as he claimed he was.  Dr. Anderson and Dr. Ghavam both were prior treating physicians who tested and treated Plaintiff in a similar manner, but both Dr. Ghavam and Dr. Anderson found that Plaintiff could return to work.  (Tr. 201, 204, 224).  Thus, the ALJ properly discredited Dr. Murphy's opinion because the totality of the medical evidence contradicted his findings.

As the Eleventh Circuit recently has stated, "the ALJ is not required to give a treating physician's opinion considerable weight when [Plaintiff's] own testimony regarding his daily activities controverts that opinion."  *Leiter*, 2010 WL 1794177, at *4; *see also Phillips,* 357 F.3d at

1241.  The ALJ found that when Plaintiff completed his Daily Activities Questionnaire on February 1, 2007, he reported that he had the ability to perform various activities.  (Tr. 15).  "Those activities included caring for his personal needs without assistance, shopping once a week, going out of the house once or twice a day, watching television and visiting family and friends."  (Tr. 15).  In this report, Plaintiff also admits to driving around "to keep his mind off the pain."  (Tr. 98).  Moreover, in a letter written by VE Patsy Bramlett, dated February 8, 2007, she stated that Plaintiff "owns and feeds his horses" and "mows his lawn."  (Tr. 129).  During the hearing with the ALJ, Plaintiff stated "every once in awhile I'll do some cooking and sometimes I'll put clothes in the washer."  (Tr. 28).  Plaintiff also stated he drives to get a hamburger occasionally, and that he drove twenty minutes to the hearing that day.  (Tr. 29).  Therefore, the ALJ found that Plaintiff's own testimony reveals that he is not as limited as he claims.   (Tr. 15).  Thus, Plaintiff's own admissions are at odds with the opinion of his treating physician, Dr. Murphy, making the ALJ's decision to discredit those findings proper.  *See Leiter*, 2010 WL 1794177, at *4; *see also Phillips,* 357 F.3d at 1241.

The ALJ properly gave little weight to the opinion of Dr. Murphy because it was inconsistent with his own medical treatment, unsupported by his own clinical findings, contrary to other medical evidence of prior treating physicians, and contradicted by  Plaintiff's own admissions.  The ALJ clearly stated his reasons for rejecting Dr. Murphy's opinion, and there is substantial evidence to support his conclusion. The ALJ did not consider the December 16, 2005 FCE taken alone, but found that it was consistent with the totality of the medical evidence. Therefore, the ALJ properly complied with the treating physician rule and did not err by disregarding Dr. Murphy's opinion.

**B.**      **The ALJ Properly Evaluated Plaintiff's Pain and Non-Exertional Impairments**.

Plaintiff's second argument is that the ALJ erred by discrediting his pain testimony.  (Doc.

18

# 7 at 13). Specifically, Plaintiff asserts that the ALJ failed to "articulate adequate reasons for discrediting his pain testimony." (Doc. #7 at 14). However, the ALJ did give adequate reasons to properly discredit Plaintiff's pain testimony. (Tr. 15-17).

The Eleventh Circuit has established a three-part pain standard that applies when a claimant asserts a disability through testimony of pain or other subjective symptoms. *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). When a claimant alleges disability through subjective complaints of pain or other symptoms, the Eleventh Circuit's "pain standard" for evaluating these symptoms requires: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence that confirms the severity of the alleged pain or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain. *See Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002). The pain standard does not require objective proof of the pain itself. *Elam v. R.R. Ret. Bd.*, 921 F.2d. 1210, 1215 (11th Cir. 1991). However, the Act and Regulations do require that a claimant produce objective medical evidence of a condition that reasonably could be expected to produce the kind of pain alleged; mere allegations of disabling pain are insufficient. *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.929(b) (2006). Once such a medical condition is identified, a variety of factors are considered in evaluating the intensity and persistence of symptoms, such as pain, which would limit an individual's capacity for work, including daily activities, type and dosage of medication, treatment history, medical findings, and physicians' opinions. 20 C.F.R. § 416.929(c) (2006).

Under the Regulations, the initial inquiry involves whether a claimant's condition can cause the kind of pain alleged and does not entail any analysis of the severity, intensity, or persistence of the actual symptoms resulting from the medically documented condition. *See* 20 C.F.R. § 416.929(b)

19

(2006). However, the inquiry does not end with the application of the pain standard.   The Regulations set forth a secondary inquiry which does evaluate the severity, intensity, and persistence of the pain and symptoms a claimant actually possesses. *See* 20 C.F.R. § 416.929(c)-(d) (2006). Indeed, there is a difference between meeting the judicially created pain standard and having *disabling* pain; meeting the pain standard is merely a threshold test to determine whether a claimant's subjective testimony should even be considered at all to determine the severity of that pain.  *See* 20 C.F.R. § 416.929(b) (2006); *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992) ("The Secretary must consider a claimant's subjective testimony of pain if [the pain standard is met]."). After considering a claimant's complaints of pain, an ALJ "may reject them as not creditable." *Marbury*, 957 F.2d at 839.

Although a reversal is warranted if the ALJ's decision contains no indication of the proper application of the three-part pain standard, *Holt v. Sullivan*, 921 F.2d. 1221, 1223 (11th Cir. 1991), the Eleventh Circuit has held that an ALJ's reference to 20 C.F.R. § 404.1529, along with a discussion of the evidence, demonstrates the proper application of the pain standard. *Wilson*, 284 F.3d at 1225-26.  In this case, the ALJ cited 20 C.F.R. § 404.1529 in his decision and discussed his reasons for finding that Plaintiff's allegations of disabling pain and functional limitations were not credible. (Tr. 14-17).  Specifically, the ALJ considered Plaintiff's daily activities in evaluating his subjective pain complaints, and found that they were inconsistent with the testimony of his level of pain.  (Tr.15); *see* 20 C.F.R. § 416.929(c)(3)(I) (2006).  While the performance of sporadic or simple functions may not necessarily defeat a disability claim, the Eleventh Circuit has acknowledged the relevance of daily activities in these cases. *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986) (noting that plaintiff's activities of taking care of his personal needs, visiting with his sick aunt,

and helping his wife around the house, including sweeping and carrying out the garbage, supported the ALJ's finding that the plaintiff did not suffer from disabling pain).  In this case, the ALJ noted that despite Plaintiff's complaints of pain, he maintains the ability to care for his personal needs, prepare some meals, shop, perform some simple household chores, watch television, mow his lawn, care for his horses, visit with others, and drive around "to take his mind off the pain. (Tr. 15-17, 28-29, 98, 129).  As was the case in *Wheeler*, Plaintiff's daily activities contradict his claim that he has disabling pain.  As previously noted, the ALJ also reported that prior treating physician, Dr. Anderson, found that the severity and duration of symptoms alleged by Plaintiff did not match what was found on the MRI results.  (Tr. 15).  Additionally, the ALJ considered the depression and anxiety that Plaintiff suffered and found no evidence in the record to suggest that Plaintiff is limited in relation to his mental functioning.  (Tr. 16).  Consequently, the ALJ reasoned that Plaintiff's daily activities were contradictory to his alleged levels of pain, and the ALJ properly supported his conclusion with substantial evidence.

An ALJ may consider a claimant's failure to comply with the treatment regimen prescribed as a factor in determining credibility of his pain complaints.  *Brown v. Astrue*, 298 Fed. App'x 851, 853 (11th Cir. 2008).  The ALJ found that Plaintiff was not compliant with his medications for pain.  (Tr. 16).  In two consecutive drug tests, it was evidenced that Plaintiff was not taking his prescribed medications for pain.  (Tr. 402-03, 409-10).  The refusal to follow prescribed medical treatment without good reason will preclude a finding of disability.  *Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11th Cir. 2003).  There is no explanation in the record as to why Plaintiff discontinued taking his medication for a two month period, nor is there any explanation as to why he was taking medication that was not prescribed to him.  (Tr. 402-12).  Moreover, when Plaintiff was instructed to go to

21

physical therapy to stretch his arm and increase his range of motion, he resisted any type of passive range of motion. (Tr.198-206). Additionally, when further options for treatment were suggested, Plaintiff was "not interested in any further intervention." (Tr. 224). Therefore, it was proper for the ALJ to consider Plaintiff's non-compliance in determining that his pain testimony was not fully credible.

### C.   The ALJ Properly Gave Little Weight to the Opinion of Patsy Bramlett.

The ALJ properly afforded little weight to Patsy Bramlett's opinion. First, it could not be viewed as a determining factor in this case. Second, Patsy Bramlett's opinion is contradicted by her own findings. (Tr. 129-33). And third, an equally qualified vocational expert testified at the hearing as to Plaintiff's capabilities and RFC, leading to the conclusion that Plaintiff could perform the work of a fork lift operator, a hand checker, a laundry checker, and a kitchen helper. (Tr. 17, 43-50).

An ALJ must present a hypothetical question containing all of claimant's impairments to allow a vocational expert's testimony to constitute substantial evidence. *Gordon v. Astrue*, 249 Fed. App'x 810, 813 (11th Cir. 2007); *see also Vega v. Comm'r. of Soc. Sec.*, 265 F.3d 1214, 1220 (11th Cir. 2001). It is unnecessary for an ALJ to utilize findings in a hypothetical that the ALJ has already found to be undecided. *Gordon*, 249 Fed. App'x at 813; *see also Crawford v. Comm'r. of Soc. Sec.*, 363 F.3d 1155, 1161 (11th Cir. 2004). Therefore, the ALJ's hypothetical must include only the limitations supported by the record. *Gordon*, 249 Fed. App'x at 813; *see also Jones v. Apfel*, 190 F.3d 1224, 1229 (11th Cir. 1999). In this case, the ALJ submitted a hypothetical containing all of Plaintiff's impairments. (Tr. 44-46). Because Plaintiff's pain complaints were already properly discounted, the ALJ was not required to include them in the hypothetical. Additionally, Patsy Bramlett's report indicates that she reviewed the entire medical record, but as previously stated, the

medical record is littered with evidence that Plaintiff is not as limited as he claims as documented by prior treating physicians.  (Tr. 201, 203, 224).  Moreover, Patsy Bramlett's own report shows that Plaintiff owns and cares for his horses and mows his lawn.  (Tr. 129).  Thus, her report contradicts her findings that Plaintiff is one-hundred percent disabled.  Accordingly, the ALJ was correct in his decision to afford Patsy Bramlett's decision little weight.

**VII.    Conclusion**

The court concludes that the ALJ's determination that Plaintiff is not disabled is supported by substantial evidence and proper legal standards were applied in reaching this determination.  The Commissioner's final decision is therefore due to be affirmed, and a separate order in accordance with the memorandum of decision will be entered.

**DONE** and **ORDERED** this ____6th____ day of July, 2010.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE